IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| EDITH M. PARTEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:13cv944-MHT |
| | ) | (WO) |
| ALABAMA DEPARTMENT OF | ) | |
| TOURISM, a governmental | ) | |
| entity; and LEE SENTELL, | ) | |
| in his official and | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

In this lawsuit, plaintiff Edith M. Parten names as defendants her former employers, the Alabama Department of Tourism and its director Lee Sentell, and she claims that, in violation of federal law, they discriminated against her on the basis of sex and disability, retaliated against her for complaints about discrimination, and suppressed her speech. Parten relies on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a & 2000e through 2000e–17; the Americans with Disabilities Act (ADA), 42 U.S.C.

§§ 12101-12213; and the First Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983.[1]

The court has jurisdiction over her federal claims under 28 U.S.C. § 1331 (federal-question), 28 U.S.C. § 1343 (constitutional claims), 42 U.S.C. § 2000e-5(f)(3) (Title VII), and 42 U.S.C. § 12117 (ADA).

This cause is now before the court on the Tourism Department and Sentell's motion for summary judgment. For the reasons below, the court will grant summary judgment in favor of the department and Sentell on all of Parten's federal claims.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

---

1. Parten also brings a number of state claims, which will be addressed in a separate and later opinion.

a matter of law." Fed. R. Civ. P. 56(a).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

The following are the relevant facts, taken in the light most favorable to Parten.

In 2008, Sentell, as Director of the Alabama Department of Tourism, hired Parten as a Public Information Manager.  The Tourism Department is charged with promoting tourism in Alabama.

Parten's primary responsibilities were to publicize and garner publicity for Alabama events, attractions, and destinations; to create a flow of tourists, visitors, and travel writers within and to the State; and to spearhead the department's efforts to use social media.

Sentell initially approved of Parten's performance,

3

giving her highly positive reviews in 2008 and 2009. However, beginning in the second half of 2009, his attitude towards Parten worsened.  Sentell then fired Parten in 2013.

The crux of this case is whether Sentell's souring attitude and eventual termination of Parten were due to her actions or Sentell and the Tourism Department's illegal actions.  The court will, first, address two series of events that Sentell maintains justifies the firing: Parten's development of a mobile application or 'app' (designed to run on smartphones and other mobile devices) regarding Alabama civil-rights tourism; and Parten's interaction with a tourism official in Dauphin Island at a fundraiser and in setting up a subsequent trip with a travel writer to the island.  The court will then turn to Parten's claim that she was discriminated against and terminated based on her gender and her complaints about such discrimination. The court does not discuss the facts relevant to her ADA-disability and First Amendment claims because they

4

are not necessary for the opinion.

### A. Two Events

#### 1. The App

In 2010, Parten decided to develop her own travel-related mobile app related to Alabama civil-rights tourism. Although the app was not a project for the Tourism Department, she incorporated into the app photographs that were stored on the department's server in its photograph library. She also incorporated photographs she had taken with the department's camera while at work. She did not request or receive permission from the department to use the photos. Some of the department's photographs had been taken by employees, while others had been taken by professional photographers, were copyright protected, and had been purchased by the department. Parten contends she received permission from the professional photographers to use those photographs in her app.

When her app was released publicly in March 2011,

Parten issued press releases in which she identified herself as a Tourism Department employee.

The day after her app was released, and in regard to its permissibility, Parten requested a meeting and met with the assistant attorney general who provides legal advice to state agencies, including the Tourism Department. She told the attorney that she had produced an Alabama Civil Rights Trail app and wanted to confirm it was not a problem. The attorney advised her that it was fine to have a business outside of work as long as she did it on her own time and did not use state equipment. He suggested that she tell Sentell about the app as a courtesy.

Afterwards, Parten emailed Sentell about the app, and he asked her to meet with him about it. In the meeting, she denied having used state equipment to produce the app. A couple weeks later, Sentell learned that Parten's app included Tourism Department photographs and was for sale for $ 2.99. He instructed her to take down the app and told her that she had

crossed a line by using the Tourism Department's name and photographs for commercial purposes. However, she did not take the app down, as she felt that it was a personal project and that Sentell did not have the right to tell her what to do with it.

About five months later, in August of 2011, Sentell asked Parten why she had not taken down the app. During this conversation, he asked whether she had used any information from the department, and she denied doing so.

In September 2012, Sentell instructed Parten to provide him with a printed copy of the initial version of the app. She told him she did not know if it were technically possible to do so, as it had been changed since its initial release, but that she would inquire with the company that published the app. After the meeting, she contacted the publisher of the app and learned that it would not be possible to provide a copy of the initial version, as it has not been preserved. She did not inform Sentell of this conversation

7

directly but informed Sentell's executive assistant.
The executive assistant now denies that this
conversation took place, and Sentell denies receiving
the information.   Parten did not hear anything more
from Sentell about the app until January 2013 when,
shortly before terminating her, he sent her a memo
accusing her of not responding to his directive to
print the original version of the app.

## 2. Interactions with Dauphin Island Tourism Official

In October 2012, Parten and her husband attended a
charity-fundraising event without paying the
$ 100-per-person entrance fee for herself or her
husband.  Parten had been invited to the event by one
of the sponsors, and Sentell had approved her
attendance at the event in advance.  Because Parten
also had been invited to and attended the same event a
year earlier with others from her office, also without
paying, she thought nothing of not paying the second

time.[2]   When she arrived, Parten gave her name to someone at the entrance, who Parten says looked at a piece of paper with names on it and told her to enter. At the event, she was introduced to Lynne Brown, Director of the Dauphin Island Tourism Authority, who was the main sponsor of the event.[3]   They had a pleasant conversation during which Brown told Parten that she wanted to get her help with various projects.   The same month, Parten contacted Brown seeking assistance with arranging accommodations and dining for her and an Australian travel writer whom Parten was bringing to tour Dauphin Island in November 2012.   However, Parten says that, before finalizing anything with Brown, she was offered and accepted free accommodations for herself and the writer at a 'fish camp' owned by another contact.   Thereafter, Parten says, Brown

---

2. Sentell testified that the Tourisn Department had co-sponsored the event the prior year, which was why department employees had received free admission.

3. In the record, Brown at times is referred to as the Director of the South Mobile Tourism Authority.   It is not clear from the record which title is correct.

convinced her to stay at a different property on Dauphin Island and arranged for food from a bakery for Parten and the travel writer.

Brown reportedly was offended by Parten's behavior on both occasions and told a very different story. Sentell said that he heard through a mutual friend that Brown was upset at Parten about these events, so he contacted Brown. Brown told Sentell that Parten had used Sentell's name and her Tourism Department affiliation to get into the fundraiser without paying or being invited and that Parten did not socialize at the event as a tourism professional but instead as a regular guest. Brown also reportedly informed Sentell that Parten had harassed and pressured her to provide free accommodations and special meals during the trip to Dauphin Island with the travel writer. At Sentell's suggestion, Brown sent a bill to Sentell for the tickets to the fundraiser and for room and board during the November trip, and wrote a letter to Sentell outlining her concerns. Parten believes that Sentell

put Brown up to writing the letter and making the complaint so he would have a reason to terminate her, and that the allegations against her were untrue.

### B. Parten's Internal Complaints of Discrimination

Parten claims that, between late 2009 and her firing in 2013, Sentell treated her differently from the men in the Tourism Department.  Sentell spoke to her in a harsh tone and swore at her in anger.  While Sentell routinely approved certain male employees' travel plans for a year at a time, he singled Parten out for extra scrutiny, thereby delaying approval of her travel requests, and denied two of her travel requests.  He also reviewed her vouchers personally, while he allowed his executive assistant to process everyone else's vouchers, including male and female employees.

By March 2011, around the time her app was released, Parten started to complain about Sentell. She met with a lawyer at the Alabama State Personnel

11

Board and told her that she felt Sentell was subjecting her to sex discrimination, harassment, and a hostile-work environment. The Personnel Board lawyer explained various options available to her, such as filing a complaint with the Equal Employment Opportunity Commission (EEOC). After the initial meeting with this lawyer, Parten emailed Sentell and requested a meeting to discuss his treatment of her. He ignored the request.

In May 2011, Parten again emailed the Personnel Board lawyer and said Sentell had denied her travel request while allowing other men in the office to travel freely. On August 3, 2011, she again contacted the lawyer, wishing to discuss workplace harassment.

Around the beginning of 2012, Parten met with the Personnel Board lawyer again about her concerns, and the lawyer again laid out various options. One option was to contact the Governor's Office. In January 2012, Parten contacted the Governor's Director of Communications to complain about Sentell. Parten

complained about Sentell's harassment and bullying. The Communications Director told the Governor and his chief of staff that Parten had complained about Sentell. Sentell was notified of the complaint.

At some point, Parten went to Sentell's executive assistant, Cynthia Flowers, who also serves as the Tourism Department's Personnel Director, and told her she would be filing a complaint with the EEOC against Sentell for harassment and bullying. Flowers asked Parten to hold off filing with the EEOC and promised to try to help her work out her issues with Sentell. After learning that Parten had complained to the Governor's Office, Flowers again offered to mediate between Parten and Sentell. Parten says that Flowers took notes about Parten's complaints and promised to write them up and show them to Sentell in an effort to mediate between them, and that she would put the notes in Parten's personnel file. Flowers later told Parten that she had shown Parten's notes to Sentell but he refused to meet with Parten. When Parten later

13

received her personnel file, the notes were not there.

## C. Parten's Firing

In January 2013, Sentell sent Parten a memo accusing her of not responding to his directive to print the original version of the app.  Later that month, Tourism Personnel Director Flowers delivered a notice of pre-dismissal conference to Parten and sent her home on leave.  After the conference, the Tourism Department terminated Parten.  The termination letter explained that the action was based on the following violations of work rules: her "unauthorized use of photographs for profit" in her app, which photographs were stored on the Tourism Department's computer; her use of state time to take photographs for her use in her app for profit; her failure to respond in a timely manner to Sentell's request for a copy of the initial version of the app; her acceptance of a free ticket to the fundraising event to allow her husband to attend; and her demands to the Dauphin Island tourism official

14

to be accommodated and provided meals, and her use of Sentell's name in so doing, which exceeded her authority and created "liability" for the Tourism Department. Evidentiary Submission in Opposition to Motion for Summary Judgment (Doc. No. 33-19).

On June 28, 2013, Parten filed a charge with the EEOC. She now brings this lawsuit.

### III. DISCUSSION

Parten makes the following federal claims: that, in violation of Title VII, she suffered disparate treatment, on the basis of gender, as well as a retaliatory discharge; that, in violation of the ADA, she was discriminated against on the basis of disability; and that Sentell violated her right to free speech under the First Amendment when he told her to take down her app and not to tweet about tourism from her personal Twitter account.[4]   The court will address

_____

4. In their summary-judgment motion, the Tourism Department and Sentell argue that Parten has not put
(continued ....)

each claim in turn.

## A. Title VII Disparate-Treatment Claim

Parten brings her Title VII claims against Sentell in his official and individual capacity. Because the Tourism Department has been named as a Title VII defendant as well, Parten's Title VII claims against Sentell in his official capacity are redundant. <u>See Kentucky v. Graham</u>, 473 U.S. 159, 165 (explaining that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"). Furthermore, "[i]ndividual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act. ...

---

forward sufficient evidence to establish a Title VII hostile-work-environment claim. Because Parten has not responded to this argument, the court assumes Parten does not intend to make such a claim. Moreover, if she did intend to advance a hostile-environment claim, she now has abandoned it.

[T]he proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly." <u>Busby v. City of Orlando</u>, 931 F.2d 764, 772 (11th Cir. 1991) (emphasis in original).  Parten's Title VII claims are, therefore, properly against only the Tourism Department.

Title VII bars an employer from discriminating against an employee "because of ... sex."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff can establish a prima-facie case of disparate treatment by showing that: (1) she belongs to a protected class; (2) she was subjected to an adverse-employment action; and (3), in cases involving alleged bias in the application of work rules, "either (a) that [s]he did not violate the work rule, or (b) that [s]he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against [her] were more severe than those enforced against the other

17

persons who engaged in similar misconduct." <u>Jones v.</u>
<u>Gerwens</u>, 874 F.2d 1534, 1540 (11th Cir. 1989); <u>see also</u>
<u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328
(11th Cir. 2011) (explaining various ways that a
plaintiff may raise a presumption of discrimination).
Once the plaintiff meets its initial burden of alleging
a prima-facie case, the burden then shifts to the
defendant to produce a nondiscriminatory reason for the
adverse-employment action.  <u>Id</u>. at 1325-26.  Once the
defendant has done so, the burden shifts back to the
plaintiff to show that the proffered reason is a
pretext for illegal discrimination.  <u>Id</u>.

The parties agree that, as a woman, Parten is a
member of a protected class and that she was subjected
to an adverse-employment action in being terminated.[5]

---

[5]. The Tourism Department argues that the only
adverse-employment action Parten can show was her
termination.  Parten did not respond to this argument
and only argued that she suffered disparate treatment
in her termination.  Accordingly, the court will treat
Parten's disparate-treatment claim as based solely on
her termination.

18

The Tourism Department argues that Parten cannot show that it treated similarly situated male comparators more favorably than her and that she cannot establish that the given reasons for her termination were a pretext for unlawful discrimination.  The court agrees.

When a plaintiff alleges disparate treatment in discipline, to determine whether proposed comparators are similarly situated courts must evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting Maniccia v. Brown, 171 F. 3d 1364, 1368 (11th Cir. 1999) (citations and quotation marks omitted)).[6]   Parten puts forward three male

---

6. The meaning of the phrase 'similarly situated' in Title VII has been the subject of conflicting interpretations in the Eleventh Circuit.  One line of cases holds that the comparator's conduct must merely be similar.  See, e.g., Alexander v. Fulton Cnty., Ga., 207 F.3d 1303, 1333-34 (11th Cir. 2000) (rejecting nearly identical standard in favor of similar-conduct standard), overruled on other grounds, Manders v. Lee, 338 F. 3d 1304 (11th Cir. 2003); King v. Piggly Wiggly Alabama Distribution Co., 929 F. Supp. 2d 1215, 1223 (continued ....)

comparators: Grey Brennan, Kerry Teague, and Brian Jones.   However, none of these is an appropriate comparator.

As an initial matter, none of these individuals was accused of a similar combination or number of offenses as Parten.   This fact alone destroys their usefulness as comparators.   But even in the particulars of their offenses, they cannot be considered similarly situated.

Parten argues that Brennan and Teague were

_____

(N.D. Ala. 2013) (Hopkins, J.) (requiring only similar conduct and rejecting the nearly identical standard as inconsistent with the intent of Title VII).

Another line of cases holds that, for a comparator to be considered similarly situated, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Burke-Fowler, 447 F.3d at 1323 (emphasis added).   In Burke-Fowler, the court acknowledged that the Alexander court had required only similar conduct but reasoned that, under the 'prior panel' rule, it was bound to follow the 1999 ruling in Maniccia, 171 F.3d at 1368, which adopted the nearly identical standard in discipline-related cases.   See Burke-Fowler, 447 F.3d at 1323, n.2.

Under either standard, the result here would be the same.

similarly situated in that they both admitted to receiving 'comped,' that is, free meals and rooms, and not being terminated for it.  But the reason the Tourism Department put forward for terminating Parten was not her mere receipt of free accommodations and food:  It was her alleged inappropriate demands and pressure to provide free accommodations and food, as well as her unauthorized use of Sentell's name in doing so.

Jones is no better as a comparator.  Parten argues that Jones is similarly situated because he committed two punishable offenses--insubordination and use of abusive or threatening language--but was not terminated.[7]  Parten is not accused of using abusive or threatening language, so Sentell's actions regarding Jones's use of such language do not render him similarly situated.  As for the insubordination charge,

---

7. While standing by the Tourism Personnel Director's desk in the presence of other employees, Jones told her that he wanted to kill everyone in the office except her, because she was helping him to get a raise.  Sentell did not view the statement as a threat.

Jones's insubordination occurred in a staff meeting, when, upon receiving an instruction from Sentell, Jones told him the instruction was "stupid". Evidentiary Submission in Opposition to Summary Judgment, Parten Deposition (Doc. No. 33-1), at 363-64. Instead of punishing Jones, Sentell reportedly replied that Jones did not have to do anything he did not want to. If true, Sentell's muted acceptance of Jones's insubordination could raise concern of disparate treatment as to Parten's insubordination.

However, as noted above, Parten was not terminated for insubordination alone; instead, she was terminated for insubordination combined with alleged inappropriate demands for free accommodations and food; not paying for a $ 100 ticket to bring her husband to a charity event; the use of state property in her app; and taking pictures for her app during work hours. Sentell's decision not to terminate Jones for one instance of insubordination and one instance of threatening language--which Sentell, rightly or wrongly, did not

view as threatening--simply is not comparable to his decision to terminate Parten for multiple offenses.

Parten also attempts to meet her prima-facie burden by arguing that she did not commit some of the acts for which she was terminated or that she had reason to believe that her actions were permissible. However, Parten does not dispute most of the grounds for termination effectively or at all. As discussed earlier, the Tourism Department allegedly terminated Parten for a combination of actions: her unauthorized use of Tourism Department photographs for profit in her app; her use of state time to take photographs for her use in her app for profit; her failure to respond in a timely manner to Sentell's request for a copy of the initial version of the app; her acceptance of a free ticket to the fundraising event to allow her husband to attend; her demands to the Dauphin Island tourism official for food and housing and her use of Sentell's name in so doing.

First, Parten admits that some of the photographs

she used in her app were ones that she took at work using a Tourism Department camera.  In an attempt to rebut this justification, she contends that Sentell used state photographs in a book he wrote and that he was prohibited from publishing it as a result. However, Sentell testified that he completed the book before he started working at Tourism; that he obtained permission from the Department to use the Tourism Department pictures that appear in the book; and that the book actually was published.  Parten has not presented any evidence--only allegations--to rebut this testimony.  Accordingly, Parten's attack on this justification for her termination fails.

Parten also disputes the charge that she failed to respond in a timely manner to Sentell's request for a copy of the initial version of the app.  Parten offers four arguments as to why the court should discount this ground for her termination.  First, she argues that this charge is pretext because she told Sentell when he first asked that she did not know if she could get a

24

copy of the original version of the app, as she thought
it existed only online.  However, it is clear that,
even though she did give that caveat, she agreed to
inquire with the company that produced that app about
whether they had a copy.  Given that she agreed to make
the inquiry, it was reasonable for Sentell to expect a
response.  Next, Parten argues that she actually
responded to Sentell a week after he had requested the
information by telling his executive assistant that it
was not possible to get a copy of the initial version
of the app.  However, Sentell denied learning of
Parten's news from his assistant, and Parten has no
evidence to dispute the contention that Sentell was
unaware she had responded.  Third, Parten argues that
Sentell called the app company himself to find out if a
copy of the initial app was available sometime in the
fall of 2012 and learned that it was not, and,
accordingly, that he did not need a response from
Parten after that time.  However, an employer is
entitled to have an employee respond to his request for

information, whether he needs the information or not.
Finally, Parten argues that she directly informed
Sentell in January 2013 that she was unable to get a
copy. However, at that point, her response was
untimely. For these reasons, Parten has not rebutted
this ground for her termination.

Parten also was terminated for bringing her husband
to the charity-fundraising event without paying $ 100
for a ticket. To rebut this ground, Parten points to
evidence that she attended the event at the request of
one of the organizers and one of the hosts of the event
and that Sentell approved her travel to the event.
Parten also denies that she used Sentell's name to get
into the event and contends that she did not know the
tickets cost $ 100 each or that she was supposed to pay
for the tickets. However, she has not rebutted the
fact that the event had a $ 100 admission price or that
she brought her husband to the event although he had
not been invited to attend for free. Furthermore, the
key issue is not whether she thought she was doing

something wrong; the key issue is whether Sentell
reasonably believed she had done something wrong.
<u>Jones v. Gerwens</u>, 874 F.2d 1534, 1540 (11th Cir. 1989)
("For purposes of Title VII analysis, it is thus of no
consequence that Jones now disputes the charges. The
law is clear that, even if a Title VII claimant did not
in fact commit the violation with which he is charged,
an employer successfully rebuts any prima facie case of
disparate treatment by showing that it honestly
believed the employee committed the violation."); <u>Damon
v. Fleming Supermarkets Of Florida, Inc.</u>, 196 F.3d
1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires
an employee under the mistaken but honest impression
that the employee violated a work rule is not liable
for discriminatory conduct."); <u>McCall v. Johanns</u>, 2008
WL 895347, at *7 (M.D. Ala. 2008) (Thompson, J.)
("[W]ith disciplinary infractions that lead to
termination, the employer need not be correct in
believing that an event that leads to a job action
occurred; the employer need only have a good-faith

belief that the event occurred.").  Parten has failed to introduce evidence suggesting Sentell did not.

Parten also denied that she pressured Brown, the Dauphin Island tourism official, to provide her and the travel writer with free luxury accommodations or meals. However, as noted above, the key issue is not whether she actually committed the offenses of which she was accused, but whether Sentell had a good-faith basis for believing she had committed those offenses.  While Parten testified that she believed Sentell had put Brown up to making the complaint against her, Parten's belief is not evidence.  Lacking evidence that Sentell knew the allegations were false and put Brown up to making them, Parten has failed to rebut this justification for her termination.  Accordingly, Parten has failed to establish a prima-facie case of disparate treatment.

Moreover, as Parten has not been able to rebut the proffered justifications for her termination, she has also failed to show that those justifications are

pretext for sex discrimination.

The motion for summary judgment will be granted in the Tourism Department and Sentell's favor on Parten's Title VII disparate-treatment claim.

## B. Title VII Retaliation Claim

Parten claims that, in violation of Title VII, she was terminated in retaliation for complaining of discrimination. The Tourism Department argues that it is entitled to summary judgment on this claim because Parten failed to exhaust administrative remedies and failed to show that the department's reasons for terminating her were a pretext for retaliation and that retaliation was the but-for cause of her termination. The court will address each argument in turn.

### 1. Failure to Exhaust

Before filing a Title VII action, "a plaintiff first must file a charge of discrimination with the

29

EEOC."   Gregory v. Georgia Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004).   The Tourism Department argues that Parten failed to exhaust administrative remedies because the only protected activity she mentioned in her EEOC charge was the complaint she made to the Governor's Office, but her lawsuit mentions only the complaints she made to the attorney for the State Personnel Board.   Parten's EEOC charge states: "In June 2012, I complained to the Governor's Officer, of harassment that I was being subjected to by my Supervisor and Department Head, Charles Sentell. ... Since complaining, I have been retaliated against."    Evidentiary Submission in Support of Motion for Summary Judgment  (Doc. No. 25-21).

The case law does not support the department's position.  A plaintiff's EEOC charge need not be a precise pleading; indeed, because courts are "extremely reluctant to allow procedural technicalities to bar claims brought under Title VII, ... the scope of an

EEOC charge should not be strictly interpreted." Gregory, 355 F.3d at 1280 (internal quotation marks omitted). The question is whether charges in a lawsuit were "like or related to, or grew out of, the allegations contained in [the] EEOC charge" such that a "reasonable EEOC investigator" could have accomplished her role of investigating and seeking voluntary settlement of the claim. Id.

Gregory provides an example of this generous standard. In that case, the plaintiff, an African-American doctor hired by a state hospital, was fired six months after making internal complaints to management about discrimination. On her EEOC charge, she stated that she was fired for "no legitimate reason" and checked the boxes for race and sex discrimination but not for retaliation. Id. at 1278-79. Nevertheless, the appellate court found she had exhausted her retaliation claim with the EEOC because a reasonable investigator would have examined the reasons for Gregory's firing and realized it was

31

related to earlier complaints about discrimination to her supervisor. Id. at 1280; cf. Minix v. Jeld-Wen, Inc., 237 Fed. App'x 578 (11th Cir. 2007) (holding that plaintiff's tangible-employment-action claim in her complaint was "wholly distinct" from the hostile-work-environment claim in her EEOC filing and thus barred for failure to exhaust).

In her complaint, Parten is not trying to raise a new claim that is 'wholly distinct' from the claim in her EEOC charge. Parten's claim that she suffered retaliation for bringing complaints of harassment and sex discrimination to the Personnel Board lawyer is 'like or related to' the claim in her EEOC charge that she was terminated for complaining of harassment to the Governor's Office. Indeed, Parten raised concerns about the same pattern of harassment by Sentell on both instances. In addition, a reasonable investigator would have asked Parten if she made any other complaints about Sentell's alleged harassment and disparate treatment in the course of the investigation

32

of her EEOC charge.    Therefore, the court will not
grant   summary   judgment   in   favor   of   the   Tourism
Department   on   Parten's   retaliation   claim   on   this
ground.

### 2. Pretext and But-For Causation

To   establish   retaliation   under   Title   VII,   the
plaintiff must meet the ultimate burden of showing that
the reasons given for an adverse action were a pretext
for retaliation and that retaliation was the but-for
cause of the adverse action.   Univ. of Texas Sw. Med.
Ctr. v. Nassar, 133 S. Ct. 2517 (2013).

The Tourism Department argues that Parten cannot
establish that the reasons given for her termination
were pretextual or that retaliation was the but-for
cause of her termination.   The court agrees.   As
discussed   above   in   the   analysis   of   her
disparate-treatment claim, Parten has not put forward
evidence sufficient to rebut all or even most of the
Tourism   Department's   proffered   reasons   for   her

termination; she has not submitted sufficient evidence to show that Sentell did not have a good-faith belief that the reasons were legitimate.  Nor has she put forward any other direct or circumstantial evidence revealing retaliatory intent.

Furthermore, the lag in time between her internal complaints and her termination undermines her claim of a but-for causal relationship.  Parten complained to the Personnel Department lawyer in 2011 and early 2012 and to the Governor's Office in January 2012, yet Sentell did not terminate Parten until January 2013. While this lapse of time does not preclude a finding of causation, the approximately one-year lapse following Parten's complaint to the Governor's Office and the one- and two-year lapses following her complaints to the Personnel Department lawyer are simply too long for the court to infer a causal link.  See Webb-Edwards v. Orange Cty. Sheriff's Office, 525 F.3d 1013, 1029 (11th Cir. 2008) (six-month gap too long to support causation element in retaliation case).

34

Accordingly, the court will grant summary judgment in favor of the Tourism Department and Sentell on Parten's Title VII retaliation claim.


## C. Americans with Disabilities Act Claim

Title I of the ADA prohibits certain employers, including state employers such as the Alabama Tourism Department, from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  To this end, the statute requires employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would

impose an undue hardship on the operation of the [employer's] business." § 12112(b)(5)(A).

Parten does not clarify whether she is suing Sentell and the Tourism Department or only the department and whether she is suing Sentell in his individual or official capacity. In any case, Title I of the ADA "does not provide for individual liability, only for employer liability." Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996). Moreover, because a suit against a state employee in his official capacity is treated as a suit against the state agency for which he works, Kentucky v. Graham, 473 U.S. 159, 166 (1985), to the extent Parten seeks damages against Sentell in his official capacity, such a claim would be redundant. For these reasons, the court's analysis will focus on the claim for damages against the Tourism Department.

The Tourism Department argues that Parten's ADA Title I claim is barred by the Eleventh Amendment to the United States Constitution, which protects non-consenting States from suits for damages by private

citizens in federal court.  See College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd., 527 U.S. 666, 669-670 (1999).  Congress can abrogate the States' sovereign immunity when it unequivocally expresses its intent to do so and acts pursuant to a valid grant of constitutional authority.  Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000).  In Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 363-64, 372-74 (2001), the Supreme Court held that Title I of the ADA exceeded Congress's constitutional authority to proscribe conduct to remedy and deter Fourteenth Amendment violations for two reasons: Title I's broad sweep was not sufficiently targeted to remedy or prevent unconstitutional discrimination in public employment; and Congress failed to identify a pattern of irrational state-employment discrimination against the disabled that justified the remedy it created. Since Garrett, state employers have been immune from suits for damages under Title I of the ADA.

37

Parten contends, without explanation, that the ADA Amendments Act of 2008 (hereafter "the ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553, which was enacted years after <u>Garrett</u>, effectively abrogated the States' Eleventh Amendment immunity from suits for damages under Title I. The court disagrees. "Congress enacted the ADAAA with the express purpose of rejecting the holdings of several Supreme Court cases interpreting the statutory provisions of the ADA. Notably, while the ADAAA's legislative findings specifically identify those holdings which Congress sought to address, they do not mention <u>Garrett</u> or the States' Eleventh Amendment immunity." <u>Adamson-James v. Florida Dep't of Corr.</u>, 2013 WL 1968499, at *4 (M.D. Fla. 2013) (Honeywell, J.) (citations omitted). Nor does the ADAAA contain any express findings of a history of discrimination against people with disabilities in state employment. <u>See Garrett</u>, 531 U.S. at 371 (noting the absence of such a record as a reason that Congress failed to abrogate Eleventh Amendment immunity).

38

Finally, Parten has not pointed to, and the court has not found, anything in the ADAAA that would alter <u>Garrett</u>'s conclusion that the remedies imposed by the ADA are not 'congruent and proportional' to the targeted violations.  <u>See</u> <u>Garrett</u>, 531 U.S. at 372–74. <u>See also</u> <u>Adamson-James</u>, 2013 WL 1968499, at *4. Accordingly, the court cannot find that the ADAAA validly abrogated Alabama's Eleventh Amendment immunity from suits for damages under Title I.

Because, with Title I, Congress did not validity abrogate the States' Eleventh Amendment immunity from suits for damages and because the sovereign immunity provided to the State of Alabama extends to its state agencies, such as the Tourism Department, <u>see, e.g.</u>, <u>Florida Dept. of Health & Rehabilitative Servs. v. Florida Nursing Home Ass'n.</u>, 450 U.S. 147 (1981), sovereign immunity prevents Parten from prevailing on her Title I claim against the Tourism Department to extent she seeks damages.

Admittedly, in her complaint, Parten stated her intent to seek the injunctive relief of reinstatement and unspecified equitable remedies for the alleged violation of her ADA rights. To the extent that she seeks only prospective, injunctive relief against a state official in his official capacity, Parten's claim is not barred by the Eleventh Amendment. See Garrett, 531 U.S. at 374 n.9; see also Ex Parte Young, 209 U.S. 123 (1908). However, in her response to the ADA-related part of the motion for summary judgment, she makes no argument that the part of her ADA claim seeking injunctive relief should survive in spite of the Eleventh Amendment. In addition, she describes her ADA claim as based only on the Tourism Department's denial of her requests for a certain chair and computer mouse and screen--not her termination. She does not argue that her request for these purported accommodations was in any way related to her termination. The court cannot conceive of equitable relief that would address the accommodations claim she

40

currently advances.  Accordingly, the court finds that she has abandoned her claim for injunctive relief under the ADA.  See  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. ... Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citations omitted).[8]

Accordingly, the court will grant summary judgment in favor of the Tourism Department and Sentell on Parten's ADA claim.


## D. First Amendment Claim

Parten contends that Sentell and the Tourism Department violated her right under the First Amendment

---

8. The Tourism Department also argues that Parten cannot establish the elements of her ADA claim. Because the court grants summary judgment in favor of the department on other bases, it need not address this argument.

by telling her not to mention tourism or travel on her personal Twitter account and not to use a certain font on Twitter, and by ordering her to take down her civil-rights mobile app.  Parten contends that, by doing so, Sentell violated her right to freedom of expression under the First Amendment.

### 1. Tourism Department

Although not specified in her complaint, it is clear that Parten brings her First Amendment claim pursuant to 42 U.S.C. § 1983.

There is no question that the Eleventh Amendment bars Parten from suing the State of Alabama directly under § 1983 and that state agencies share this absolute immunity from suit. See Alabama v. Pugh, 438 U.S. 781, 782 (1978) ("There can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit."). Because Parten's First Amendment claim under § 1983 is

**42**

asserted directly against the Tourism Department, both
for damages and for equitable relief, summary judgment
in favor of the department on this claim is appropriate
in all respects. See Edwards v. Alabama Dep't of Corr.,
81 F. Supp. 2d 1242, 1251 (M.D. Ala. 2000) (Thompson,
J.).

The court will, therefore, turn to Parten's First
Amendment claim against Sentell in his individual and
official capacities.

## 2. Sentell in His Individual Capacity

Parten may seek only damages from Sentell in his
individual capacity because, in that capacity, he is
not in a position to afford any other relief; only in
his official capacity could he give equitable relief.
Sentell responds with the defense of qualified immunity
to Parten's request for damages from him in his
individual capacity.

In a damages suit under § 1983, a defendant
invoking the defense of qualified immunity has the

initial burden of showing that he was acting within the scope of his discretionary authority.  <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002).   Here, Sentell has shown, and Parten concedes, that he was acting within his discretionary authority when he engaged in the challenged conduct.

Once the defendant makes this showing, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  <u>Id</u>. The plaintiff must put forward evidence and argument to show that the defendant committed a constitutional violation and that the law was clearly established at the time of the violation, so that the defendant would have been "on notice that his conduct [was] unlawful."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 731 (2002).

Parten has failed to meet this burden.  She has cited no authority to show that the law was clearly established at the time Sentell acted that he had violated her First Amendment right to free expression. In addition, the court has not uncovered any First

44

Amendment case law established by either the Eleventh
Circuit or the Supreme Court divining a line, or lines,
that Sentell could not cross in telling Parten what she
could and could not do with regard to her app or her
Twitter account, under the circumstances presented
here.  Parten's development of her civil-rights mobile
app was intimately interrelated with her duties as the
Tourism Department's Public Information Manager, and
the separation between her private Twitter account and
the Tourism Department's Twitter account was murky at
best.[9]  There is no way Sentell could have known, in the
specific circumstances presented here, that he had
violated Parten's First Amendment right even if,
indeed, he had.  Accordingly, summary judgment will be
granted on Parten's First Amendment claims against
Sentell in his individual capacity.

---

9. Parten initially began tweeting for the Tourism
Department from her personal @ALTourist Twitter account
before starting a Twitter account for the department
under the name @TweetHomeAla.

45

### 3. Sentell in His Official Capacity

Because, as stated above, the Eleventh Amendment bars a § 1983 damages suit against a State as well as its agency and because such a § 1983 damages suit against a state official in his official capacity is treated as a suit against the state agency for which he works, Graham, 473 U.S. at 166, it follows that Eleventh Amendment immunity protects state officials sued in their official capacities from suits for damages under § 1983.

However, Sentell concedes that, to the extent Parten seeks only prospective injunctive and declaratory relief against him, the Eleventh Amendment does not bar her suit. See Ex Parte Young, 209 U.S. 123 (1908) (holding that sovereign immunity does not bar certain suits against state officials for prospective injunctive relief). Parten's complaint seeks not only compensatory damages but also immediate reinstatement to her former position and "any and all

other relief in ... equity to which she may otherwise be reasonably entitled." Complaint (Doc. No. 1), at 18.

Therefore, the court must determine whether Parten's First Amendment claim for prospective relief can proceed. The first task is to identify the contours of the claim as it stands today. In her response brief to the summary-judgment motion, Parten contends that Sentell violated her First Amendment right by suppressing her private speech about tourism and telling her to take down her app. Because Parten is no longer employed by the Tourism Department and therefore no longer subject to Sentell's demands that she not 'tweet' about certain subjects or take down her app, the court cannot envision any equitable remedy that would address those purported violations.

Reinstatement could constitute an appropriate remedy for retaliatory termination under the First Amendment. However, Parten has not shown her entitlement to such relief. A public employee's freedom of speech is not absolute. Vila v. Padron, 484

47

F.3d 1334, 1338 (11th Cir. 2007).  To set forth a First Amendment claim of retaliation, a public employee must show that (1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the State as an employer; and (3) the speech played a substantial or motivating role in the adverse-employment action.  Id.  If the plaintiff establishes these elements, the burden shifts to the defendant to prove he would have made the same adverse employment decision absent the employee's speech.  Id.

In his summary-judgment briefs, Sentell sets forth detailed arguments as to why Parten cannot meet any part of the legal standard to establish retaliatory termination of a public employee in violation of the First Amendment.  Parten does not respond at all to these arguments, and, in what brief response she does offer on her First Amendment claim, characterizes her claims simply as a violation of her right to free expression, unlinked to any retaliation or her

termination.    Parten   accordingly   has   abandoned   her

First   Amendment   retaliatory-discharge   claim.    See

Resolution   Trust   Corp., 43   F.3d   at   599   (11th   Cir.

1995).

Summary   judgment   will   be   granted   on   Parten's   First

Amendment   claim.


***


For   the   above   reasons,   summary   judgment   will   be

granted   in   favor   of   the   Tourism   Department   and   Sentell

on   all   of   Parten's   federal   claims.    An   appropriate

judgment   will   be   entered.

DONE, this the 20th day of April, 2015.

____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE